***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner DeLuca and the briefs and arguments of the parties. The appealing party has shown good grounds to reconsider the evidence. Having reviewed the competent evidence of record, the Full Commission reverses the Opinion and Award of Deputy Commissioner DeLuca.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties prior to, at, and following the hearing before the Deputy Commissioner as:
 STIPULATIONS *Page 2 
1. The parties are subject to the provisions of the Workers' Compensation Act
2. The Decedent was an employee of Defendant
3. Key Risk Management Services is the third party administrator on the risk.
4. The parties agree that the contested issues to be considered by the Commission at this hearing are as follows:
 a. Did the Decedent sustain an injury by accident arising out of and in the course and scope of his employment on or about May 2, 2006?
 b. What was the Decedent's average weekly wage?
 c. What benefits are Plaintiffs entitled to receive?
5. Stipulated exhibits 1 and 2 and the deposition of Dr. Lindsey L. White were admitted into the record.
 ***********
Based upon all of the competent credible evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of his death, the Decedent, Brinkley Faulcon, was employed as an assistant district attorney for the first prosecutorial district.
2. The Decedent was assigned primarily to felony prosecutions. The Decedent's office was based in Elizabeth City, North Carolina. The Decedent's district covered Gates, Chowan, and Perquimans counties.
3. The Decedent's job required a significant amount of travel throughout the counties in his district. The Decedent typically drove to the various places he needed to be for his job, and *Page 3 
he was paid a mileage reimbursement for use of his automobile to conduct such travel between his office and the job-related locations.
4. The Decedent lived in Virginia Beach, Virginia. It generally took approximately fifty minutes to go between the Decedent's office and his home.
5. On May 2, 2006, the Decedent was in court in Edenton, Chowan County. Frank Parrish, the District Attorney for the First District, testified and the Full Commission finds that court ended at some time after 4:00 p.m. on that day. At some point shortly thereafter, the Decedent left the courthouse in his car.
6. According to the accident report, at approximately 4:30 p.m., the Decedent was involved in a one car accident on US 17 North, ultimately resulting in his death.
7. The accident report describes the apparent path taken by the Decedent's vehicle:
 Vehicle #1 was traveling north on US 17 bypass when it ran off of the roadway to the right. Vehicle #1 continued north on the shoulder until it collided with a fence. Vehicle #1 travelled through the fence, still north bound, and collided with a ditch. Vehicle #1 traveled through the ditch and collided with a small wooden bridge. . . . Vehicle #1 traveled a short distance further and came to rest on a dirt access road facing north.
8. The Decedent was found deceased in the vehicle when the Trooper arrived to investigate the accident.
9. There were no witnesses to the Decedent's May 2, 2006 automobile accident.
10. There is no evidence that another vehicle forced the Decedent's vehicle off of the road or that there was anything wrong with the road conditions. There is no evidence that any debris on the road played a part in the accident. There is no evidence tending to show that there was anything wrong with the Decedent's vehicle. There is no indication in the accident report *Page 4 
that there were any unusual circumstances leading to the Decedent's vehicle veering off of the road.
11. Mr. Parrish testified, and the Full Commission finds as fact, that there is no way to tell whether the Decedent was returning to his office in Elizabeth City or was going directly to his home in Virginia Beach at the time of his death. Based on the Decedent's prior behavior, there was a 50% chance that the Decedent would have stopped at his office before going home. However, because the Decedent had not yet passed his office at the time of the accident, the Decedent was still entitled to mileage reimbursement at the time of his death, even if he intended to continue on directly to his home without stopping at the office.
12. On May 4, 2006, the Medical Examiner stated on the Decedent's death certificate that the immediate cause of death was sudden cardiac death. The death certificate noted that the Decedent died "minutes" after the cardiac event occurred. In addition, the death certificate stated that a secondary cause of death was dilated cardiomyopathy and it noted that the Decedent had lived with this condition for "years" prior to his death.
13. The Decedent had a long history of heart problems. Dr. Lindsey White, the Decedent's cardiologist, first treated the Decedent on April 23, 1997, nine years prior to his death. At that first date of treatment, the Decedent presented with elevated blood pressure as well as severe cardiomyopathy. Dr. White described cardiomyopathy as a weak heart. Dr. White explained that when the heart becomes weak, it becomes very difficult for the heart to pump blood to the rest of his body.
14. Dr. White described the heart's ability to pump blood in terms of an ejection fraction. He described this mechanism by stating, "The heart relaxes and receives a certain amount of blood. It then squeezes and contracts and pumps out a certain amount of that blood. *Page 5 
That amount that's pumped out is the ejection fraction." A normal person's ejection fraction would be 50-70 percent. The Decedent's ejection fraction was approximately 15 to 20 percent as of when he began care with Dr. White. Even with treatment, the Decedent's ejection fraction never returned to a normal rate.
15. Dr. White opined that the Decedent's cardiomyopathy was most likely caused by his diabetic condition as well as his poorly controlled blood pressure. As a result of the cardiomyopathy that had developed, the Decedent developed symptoms of congestive heart failure.
16. Dr. White stated that the Decedent was significantly overweight. He described the Decedent as being thirty to forty percent overweight. Dr. White also indicated that the Decedent had difficulty sleeping due to sleep apnea, a condition most often found in individuals who are overweight and which can itself result in additional heart problems.
17. Dr. White made clear that, as a result of his physical condition, the Decedent was far more likely to die of heart failure than the average ordinary individual.
18. When asked whether the cause of death listed on the death certificate was consistent with the symptoms for which he had treated the Decedent, Dr. White responded that the autopsy report indicated to him that the Decedent died of sudden cardiac death, meaning that it was unexpected or happened suddenly, and the etiology of that death was a cardiomyopathy.
19. Dr. White explained that "sudden cardiac death" can be distinguished from a "heart attack" in that the Decedent's heart apparently did not stop beating immediately, but instead began beating inefficiently, resulting in the ineffective pumping of blood and leading to the Decedent's loss of consciousness and death. Dr. White acknowledged that an external factor could have triggered such an irregular heartbeat in the Decedent. *Page 6 
20. Presented with a hypothetical by Plaintiffs' counsel, Dr. White testified that it was "possible" that the Decedent fell asleep while driving, a potential result of the Decedent's sleep apnea, that he was awakened suddenly as his car left the road, and that the shock of that awakening could have triggered the irregular heartbeat that resulted in the Decedent's death.
 I think that's possible. I mean, what you're asking is this question, I think. Can a person be frightened to death? And I think probably a person can as a result of intense fright or something like that. That's possible. I don't know if it happened in this case or not, but I think that's possible.
Dr. White explained that we simply do not know what happened to the Decedent on May 2, 2006, because "we don't know and nobody was there. Nobody was there to describe, you know, what happened at that time."
21. The Full Commission finds, based on the evidence of record, that there is insufficient evidence to determine whether the Decedent experienced a cardiac event which led to his automobile accident, or whether the Decedent experienced an automobile accident which led to his cardiac event.
22. At the time of his death, the Decedent was survived by his widow, Patrice Faulcon, a son, Brandtrick A.J. Faulcon, born January 3, 1990, and two other children who were emancipated as of May 2, 2006.
23. At the time of his death, the Decedent's average weekly wage was $1,259.52. The maximum compensation rate for 2006 was $730.00.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 CONCLUSIONS OF LAW *Page 7 
1. To be compensable under the Workers' Compensation Act, an injury must have been sustained "by accident arising out of and in the course of the employment" pursuant to N.C. Gen. Stat. § 97-2(6).
2. The Decedent's car leaving the road on May 2, 2006 constituted an "accident" under the Workers' Compensation Act because it was "an interruption of the work routine and the introduction thereby of unusual conditions likely to result in unexpected consequences."Gunter v. Dayco Corp.,317 N.C. 670, 673, 346 S.E.2d 395, 397 (1986).
3. The Decedent was "in the course of" his employment at the time of his automobile accident pursuant to the "contractual duty" exception to the "going and coming rule." Although the evidence is insufficient to show whether the Decedent was returning to his office or driving directly home at the time of the accident, the accident occurred at a location where the Decedent was still entitled to mileage compensation for his travel. It follows that, at the time of the accident, the Decedent's employer was "contractually provid[ing] transportation or allowances to cover the cost of transportation." Munoz v. Caldwell Memorial Hosp.,171 N.C. App. 386, 390, 614 S.E.2d 448, 451 (2005) (citation omitted);see also, Puett v. Bahnson,231 N.C. 711, 58 S.E.2d 633 (1950).
4. In regard to whether the Decedent's death occurred "by accident" and "arising out of" his employment, Plaintiffs are entitled to a presumption of compensability pursuant toPickrell v. Motor Convoy, Inc.,322 N.C. 363, 368 S.E.2d 582 (1988):
 In cases . . . where the circumstances bearing on work-relatedness are unknown and the death occurs within the course of employment, claimants should be able to rely on a presumption that death was work-related, and therefore compensable, whether the medical reason for death is known or unknown. *Page 8 
Id. at 370, 368 S.E.2d 586. The Pickrell presumption applies both to the "by accident" and "arising out of" elements of compensability. See id. at 368, 368 S.E.2d 584-85.
5. To overcome the Pickrell presumption in favor of Plaintiffs, Defendant "has the burden of producing credible evidence that the death was not accidental or did not arise out of employment." Bason v. Kraft Food Service, Inc.,140 N.C. App. 124, 128, 535 S.E.2d 606, 609 (2000). Defendant has failed to meet that burden in the present case. In particular, Dr. White's medical testimony is insufficient to show affirmatively that the Decedent's death was not accidental or that it did not arise out of the Decedent's employment.
6. Because the evidence of record, together with thePickrell presumption, show that the Decedent's death was the result of an injury "by accident arising out of and in the course of the employment" pursuant to N.C. Gen. Stat. § 97-2(6), it follows that the Decedent's May 2, 2006 death is compensable under the Workers' Compensation Act. N.C. Gen. Stat. § 97-38.
7. Plaintiffs Patrice Faulcon and Brandtrick A.J. Faulcon, as the Decedent's widow and unemancipated child respectively, are conclusively presumed to be wholly dependent for support upon the Decedent. N.C. Gen. Stat. § 97-39. Plaintiffs are accordingly entitled to receive 400 weeks of compensation payable share and share alike to the exclusion of all other persons. N.C. Gen. Stat. § 97-38(a).
8. Given the Decedent's average weekly wage of $1,259.52, Plaintiffs are entitled to the maximum weekly compensation rate for 2006 of $730.00. N.C. Gen. Stat. § 97-38. Divided share and share alike, each Plaintiff is accordingly entitled to weekly compensation in the amount of $365.00.
9. Plaintiffs are entitled to payment of any medical expenses incurred for the treatment of the Decedent on May 2, 2006. N.C. Gen. Stat. § 97-25. *Page 9 
10. Defendant shall pay funeral expenses not to exceed $3,500.00 to the appropriate party who provided or previously paid for such services. N.C. Gen. Stat. § 97-40.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the undersigned makes the following:
 AWARD
1. Subject to the attorney's fee approved below, Defendant shall pay to Patrice Faulcon death benefits at the rate of $365.00 per week for 400 weeks beginning May 2, 2006. Those amounts that have accrued shall be paid in a lump sum.
2. Subject to the attorney's fee approved below, Defendant shall pay to Brandtrick A.J. Faulcon death benefits at the rate of $365.00 per week for 400 weeks beginning May 2, 2006. Those amounts that have accrued shall be paid in a lump sum.
3. Defendant shall pay burial expenses not exceeding $3,500.00 to the person or persons entitled thereto.
4. Defendant shall pay medical expenses, if any, incurred as the result of the Decedent's death.
5. A reasonable attorney's fee of 25% of the death benefits awarded in Paragraphs 1 and 2 above is approved for Plaintiffs' counsel and shall be paid as follows: Defendant shall pay 25% of the accrued benefits directly to Plaintiffs' counsel. Thereafter, every fourth check to each Plaintiff shall be paid directly to Plaintiffs' counsel.
6. Defendant shall pay the costs due the Commission.
This the 7th day of October, 2009. *Page 10 
 S/___________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ STACI T. MEYER COMMISSIONER
 S/___________________ LAURA K. MAVRETIC COMMISSIONER